UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:16-cr-00213-JMS-TAB |
| | ) | |
| DIANGELO VALES (01), | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

Presently pending before the Court is Defendant Diangelo Vales' Motion to Suppress. [Filing No. 23.] Mr. Vales has been indicted with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). [Filing No. 1.] He seeks to suppress evidence recovered after what he contends was an illegal search in violation of his Fourth Amendment rights, as well as evidence of a statement made following that search. Because the evidence does not support any constitutional violations, the Court denies his Motion.

**I.**
**FINDINGS OF FACT**[1]

On September 21, 2017, the Court held an evidentiary hearing on Mr. Vales' Motion to Suppress. [*See* Filing No. 39.] The following are the Court's factual findings from the evidence presented at that hearing and submitted with the parties' briefs. In making the findings that follow, the Court has considered the testimony and the demeanor of the witnesses who testified at the evidentiary hearing: Indianapolis Metropolitan Police Department ("IMPD") Officer Richard Faulkner, IMPD Officer Trent Fortson, and IMPD Officer Dane Elkins.

---

[1] To the extent that any findings of fact should be considered conclusions of law, they should be deemed to be such.

On May 14, 2016 at approximately 8:14 p.m., Officer Faulkner was driving his marked police vehicle behind Mr. Vales, who was driving northbound on Kenwood Avenue in Indianapolis, Indiana. [Filing No. 22-1 at 2.] While turning eastbound on 34th Street, Mr. Faulkner observed Mr. Vales disregard a stop sign. [Filing No. 22-1 at 2.] Officer Faulkner immediately initiated a traffic stop of Mr. Vales' vehicle. [Filing No. 22-1 at 2.] 34th Street contained three lanes of traffic moving eastbound, and Mr. Vales brought his vehicle to a stop in the southernmost open lane, next to a vehicle that was parallel parked adjacent to the curb.

Officer Faulkner approached the vehicle and asked Mr. Vales, who was the only occupant of the vehicle, for his driver's license. [Filing No. 22-1 at 2.] After receiving it, at approximately 8:16 p.m., Officer Faulkner requested Mr. Vales' driving record information using the laptop computer in his police vehicle. [Filing No. 22-1 at 2; Filing No. 22-2 at 2.] Officer Faulkner, via his laptop, received information that Mr. Vales had a suspended driver's license. Because Mr. Vales was the only occupant of the vehicle, had a suspended license, and the car was stopped in a lane of traffic (as opposed to legally parked), Officer Faulkner determined that the vehicle should be towed from the scene. At approximately 8:17 p.m., Officer Faulkner radioed for backup. [*See* Filing No. 22-2 at 2].

At approximately 8:18 p.m., backup Officer Trent Fortson arrived at the scene of the traffic stop, and Officer Faulkner advised Officer Fortson of the need to tow the vehicle. The officers approached the vehicle and asked Mr. Vales to exit. Both officers testified that Mr. Vales became argumentative and initially would not exit the vehicle. When he did exit the vehicle, and remained argumentative, the officers placed him in handcuffs "for the safety" of both the officers and Mr. Vales. [Filing No. 22-1 at 2.] Officer Faulkner then commenced an inventory search of the vehicle, as required by IMPD policy, prior to the impoundment. [Filing No. 22-1 at 2.] During

that search, Officer Faulkner discovered a loaded handgun in the console of the vehicle. [Filing No. 22-1 at 2.] At approximately 8:23 p.m., Officer Faulkner radioed for the assistance of a gun liaison officer. Officer Faulkner obtained a summary of Mr. Vales' criminal history and was informed that Mr. Vales did not have a valid handgun permit and had been previously convicted of a felony offense. Mr. Vales was placed under arrest for carrying a handgun without a license with a prior conviction and possession of a handgun by a serious violent felon, and the handgun was seized. [Filing No. 22-1 at 3.] Mr. Vales was read his *Miranda* rights and stated that he understood them. [Filing No. 22-1 at 3.] Mr. Vales knowingly waived those rights and voluntarily stated that the handgun belonged to him, and that he carried it for protection.

On October 5, 2016, a federal grand jury indicted Mr. Vales of the charge of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). [Filing No. 1.] Mr. Vales now moves to suppress the evidence of the firearm recovered after what he contends to be an illegal search, as well as evidence of statements he made regarding the firearm. Having conducted a hearing on September 21, 2017 regarding the Motion, it is now ready for the Court's resolution.

## II.
### DISCUSSION

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures. . . ." U.S. Const. amend. IV. Generally, a warrantless search or seizure in the absence of probable cause is unreasonable. *United States v. Slone*, 636 F.3d 845, 848-49 (7th Cir. 2011). When police conduct an unreasonable search or seizure, the exclusionary rule usually vindicates the Fourth Amendment's protections by keeping out the unlawfully obtained evidence. *Id.*

**A. Evidence of Firearm**

"Inventory searches are a recognized exception to the warrant and probable-cause requirements of the Fourth Amendment. Searches conducted by the police prior to towing a car are lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property—and protecting the police from the owner's charging them with having stolen, lost, or damaged his property." *United States v. Cherry*, 436 F.3d 769, 772-73 (7th Cir. 2006) (internal citations and quotations omitted). Mr. Vales argues that, while the Government contends that the search of Mr. Vales' vehicle was a valid inventory search, the "inventory search" label was merely a pretextual, after-the-fact justification for an otherwise illegal search. [Filing No. 22 at 6.] In his briefing, Mr. Vales raises a question as to the chronology of events, arguing that an evidentiary hearing was necessary in order to clarify the timeline of actions taken by Officer Faulkner during the traffic stop. [Filing No. 22 at 8-9.] Mr. Vales appears to argue that (1) the IMPD was not required to tow his car, and should have chosen not to do so; and (2) Officer Faulkner chose where to initiate a traffic stop such that it would require Mr. Vales to park in a lane of traffic, thereby creating the justification to tow Mr. Vales' vehicle. [Filing No. 22 at 6-8; Filing No. 41 at 1.]

*1. Timeline of Events*

Mr. Vales takes issue with a few elements of the timeline of the search: that the tow request was not made until after the vehicle was searched; that a tow truck was not called until an hour after the initial traffic stop; and that the call for a gun liaison officer appears on the Event History Detail sheet before the information regarding Mr. Vales' status as having a suspended license. [Filing No. 22 at 6-8.]

Despite those discrepancies, the Court credits Officer Faulkner's testimony regarding the actions he took during the traffic stop, and his explanation as to how those actions compare to the

record of communications that Officer Faulkner made in the Event History Detail sheet, [Filing No. 22-2]. Officer Faulkner initiated the traffic stop at approximately 8:14 p.m. or 8:15 p.m. Officer Faulkner approached the vehicle, asked Mr. Vales for his driver's license, and requested Mr. Vales' driving record information at 8:16 p.m. Officer Faulkner testified that he received the information that Mr. Vales' driver's license was suspended, and at that point called for backup (at 8:17 p.m.), because he determined that the car would need to be towed. He testified that the information regarding Mr. Vales' suspended license does not appear on the Event History Detail sheet until 8:24 p.m. because he was required to manually copy and paste that information into that sheet, and did not do so immediately. The Court credits this testimony, and as the Government argues, this provides an objectively reasonable explanation as to why the information regarding Mr. Vales' suspended license appears after the call for backup and search of the vehicle.

After backup arrived at 8:18 p.m., Officer Faulkner testified that he began an inventory search of the vehicle. He testified that he conducted the inventory search prior to calling for a tow truck, in part because the inventory search could result in the need for further investigation. As such, Officer Faulkner stated that it is desirable to complete such investigations before a tow truck arrives. During that search, Officer Faulkner discovered the loaded handgun in the console of the vehicle, and at approximately 8:23 p.m., Officer Faulkner radioed for the assistance of a gun liaison officer.

The Court credits Officer Faulkner's testimony and finds nothing constitutionally infirm or pretextual about the order of events leading to the search of Mr. Vales' vehicle.

### 2. Propriety of Decision to Tow the Vehicle

Mr. Vales also argues that the "inventory search" was pretextual, because "[a] number of options short of towing the vehicle existed and there is no objective reason to believe that a

5

decision had been made as to securing the vehicle at the time of the search." [Filing No. 22 at 3.] The Government responds that the decision to tow was objectively reasonable. [Filing No. 24 at 8.] After considering the testimony presented at the September 21, 2017 hearing, and the evidence submitted by the parties, the Court concludes that the decision to tow Mr. Vales' vehicle was reasonable, and objective evidence supports the conclusion that Officer Faulkner intended to tow the vehicle at the time of the search.

As discussed above, the evidence regarding the sequence of events supports the conclusion that Officer Faulkner made the decision to tow Mr. Vales' vehicle at the time that he discovered that Mr. Vales' license was suspended, and that there was no licensed passenger who could move the vehicle out of the lane of traffic within which it was parked. Officer Faulkner credibly testified to that fact, and he credibly testified as to the record of events described on the Event History Detail.

Mr. Vales takes issue with the fact that he was not provided an opportunity to move the vehicle out of the lane of traffic, or to arrange for a family member or friend to do so. [Filing No. 22 at 5.] He points out that his brother lived approximately one and a half miles away and would have been available to retrieve the vehicle. [Filing No. 22 at 5.] Mr. Vales argues that this would have rendered the tow unnecessary, also obviating the need for an inventory search. First, Mr. Vales points to no law or policy suggesting that a police officer must or should allow an unlicensed or suspended driver to operate a vehicle. Second, he cites no authority for the proposition that an officer should (or under what circumstances an officer must) allow an individual to make alternative arrangements for the disposition of a vehicle if the officer determines that a tow would otherwise be necessary. Indeed, the Seventh Circuit has held to the contrary. *Cherry*, 436 F.3d at 775 ("nor does the Fourth Amendment demand that police offer a motorist an alternative means

6

of removing his vehicle that will avoid the need to tow it and conduct an inventory search") (citing *Colorado v. Bertine,* 479 U.S. 367, 373-74 (1987) (police need not give motorist "an opportunity to make alternative arrangements" that avoid impoundment)).

Moreover, Officer Faulkner complied with the written policies enumerated in IMPD General Order 7.3, regarding the towing and impounding of vehicles. *See Cherry,* 436 F.3d at 772 ("Searches conducted by the police prior to towing a car are lawful if conducted pursuant to *standard police procedures* aimed at protecting the owner's property—and protecting the police from the owner's charging them with having stolen, lost, or damaged his property.") (emphasis added). The "Procedure" section of that written policy enumerates a list of vehicles that may be towed, including a vehicle that is "[c]ausing a traffic or other hazard," or that is "[b]eing operated by a non-licensed or suspended driver." [*See* Filing No. 22-4 at 3]. Officer Faulkner testified that he believed that the vehicle at issue was causing a traffic hazard, in that it was blocking one lane of traffic. He also testified that it was being operated by a suspended driver. Therefore, he determined that towing was appropriate.

Mr. Vales challenges Officer Faulkner's reliance on the IMPD's tow policy, arguing that the structure of the policy document suggests that there was no valid basis upon which to tow Mr. Vales' vehicle. Mr. Vales argues that the towing policy document "is structured by describing two classes of vehicles subject to towing (Abandoned Vehicle and Public Nuisance)." [Filing No. 22 at 7.] Mr. Vales argues that these sections list circumstances under which vehicles may be towed, none of which apply to Mr. Vales' circumstances. First, the sections to which Mr. Vales refers are subparts of the "Definitions" section of the tow policy, which define the terms "Abandoned Vehicle" and "Public Nuisance". Those sections do not mention towing at all—not even to specify whether the defined vehicles constitute vehicles which may be towed. They simply define the

7

terms "abandoned vehicle" and "public nuisance," which are used elsewhere in the tow policy document. Mr. Vales goes on to argue that those sections are "followed by a list of 15 examples of vehicles that may be towed or impounded." [Filing No. 22 at 7.] That list is within a section entitled "Procedure," and under the subsection "Vehicles Which May be Towed." [Filing No. 22-4 at 3.] Mr. Vales contends that this list "does not purport to be a stand-alone authorization" for towing. [Filing No. 22 at 8.] However, having pointed out that the previous sections—the definitions—do not mention towing at all, the Court concludes that this section, which is entitled "Vehicles Which May be Towed," specifically enumerates vehicles subject to towing.

In any event, this issue is not dispositive, because the Court concludes that Officer Faulkner's understanding of the tow policy as allowing for the towing of vehicles that pose public safety hazards—here, causing a traffic obstruction and being operated by a suspended driver—was reasonable. The Seventh Circuit has concluded that law enforcement's "authority to order such a tow in the interest of public safety is unassailable." *Cherry*, 436 F.3d at 774 (citing *South Dakota v. Opperman,* 428 U.S. 364, 369 (1976) ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge."); *United States v. Briggs,* 273 F.3d 737, 739 (7th Cir. 2001) (truck towed from alongside road because driver's license suspended)).

Mr. Vales also points the Court to *U.S. v. Duguay*, 93 F.3d 346 (7th Cir. 1996) as authority for the proposition that the impoundment of the vehicle in this case was constitutionally infirm. [Filing No. 41 at 1.] In that case, the defendant was the passenger of a vehicle that had turned into a parking lot, just short of a police-constructed roadblock. *Duguay*, 93 F.3d at 349. The driver of the vehicle parked and locked the car, activated the alarm, and both the driver and the passenger exited the vehicle. *Id.* After they walked a distance from the car, law enforcement officers

8

approached them and asked them to stop. *Id.* An officer conducted a frisk of the defendant, to which the defendant objected, and the defendant struck the officer with his elbow. *Id.* The defendant was then arrested for assault. *Id.* After the defendant as arrested, the officer instructed the driver to give him keys to the car, because it was going to be impounded. *Id.* She refused and was arrested for obstruction of justice. *Id.* Officers then commenced an inventory search of the vehicle and uncovered narcotics. *Id.*

The defendant challenged the inventory search of the car as violating his Fourth Amendment rights and moved to suppress the narcotics that were discovered. The Seventh Circuit noted that, despite admonitions from state courts regarding the importance of a written impoundment policy, the Alton police department did not have a "written policy indicating the limited circumstances under which a car may be impounded or searched." *Id.* at 351. And apart from any written procedures, the court also stated that it was not satisfied that the police department actually "employ[ed] a standardized impoundment procedure." *Id.* at 352. The court highlighted that officers had given inconsistent statements about the circumstances under which a vehicle would typically be towed. *Id.*

The court also concluded that the police did not articulate a constitutionally legitimate rationale for impounding the defendant's car. At the suppression hearing, the officer testified that the vehicle was towed because if it had remained in the parking lot (in a high-crime area), "[t]he vehicle could be vandalized, stolen, a number of things…" *Id.* at 352. Of that rationale, the court concluded that "[t]he suggestion that the police were obliged to impound the vehicle 'to protect it' from theft or vandalism, strikes us as making up new police obligations after the fact where none existed before. The police do not owe a duty to the general public to remove vulnerable automobiles from high-crime neighborhoods." *Id.* at 352. And, as the court pointed out, the driver

9

of the vehicle was present, and before objecting to the impoundment, had keys to the vehicle and could have removed it from the scene. *Id.*

A number of circumstances distinguish the facts in *Duguay* from the facts of this case. The IMPD has a written tow policy, and as the Court has concluded, the impoundment was carried out in accordance with that policy. Second, the Court has concluded that the officers in this case articulated a constitutionally legitimate rationale for towing the vehicle—that it was parked in a manner that obstructed a lane of traffic, and that Mr. Vales (the sole occupant of the vehicle) could not move it, because he was operating the vehicle under a suspended license. The Court concludes that *Duguay* is inapplicable to the facts of this case. Under the facts present here, the Court cannot conclude that Officer Faulkner's decision to tow Mr. Vales' car was constitutionally infirm or pretextual.

*3. Location of Traffic Stop*

Finally, Mr. Vales argues that Officer Faulkner chose where to initiate a traffic stop such that it would require Mr. Vales to park in a lane of traffic, thereby creating the justification to tow Mr. Vales' vehicle. [Filing No. 41 at 1.] Officer Faulkner testified that, after a traffic stop is initiated, a citizen is free to travel a reasonable distance to find a safe spot to pull over. He stated that drivers will sometimes choose to pull into a parking lot or space prior to stopping. Mr. Vales argues that this "suggestion is contrary to 'the talk' that a responsible mother must have with her African-American child, dangerous to the participants and the public, and legally unsupportable." [Filing No. 41 at 2.]

In short, Mr. Vales asks the Court to make a series of inferences without providing any factual basis upon which to do so. Mr. Vales seems to suggest that Officer Faulkner intentionally engineered the stop with an inventory search in mind. At a minimum, to support such a series of

10

inferences, the Court would have to conclude that at the time of initiating the traffic stop, Officer Faulkner knew or believed that, following the stop, there would be a legal basis upon which to tow the vehicle. (In this case, that was Mr. Vales' status as a suspended driver.) Mr. Vales provides no evidence to support such a factual assertion.

For the reasons described above, the Court concludes that the officers conducted a reasonable inventory search on Mr. Vales' vehicle. The Court therefore **DENIES** Mr. Vales' Motion to Suppress evidence of the firearm obtained as a result of that search. [Filing No. 23.]

### B. Statements

Mr. Vales also moves to suppress his post-*Miranda* statements that the handgun belonged to him, and that he carried it for protection, arguing that the statements were derivative of the unlawful search. [Filing No. 23.] Mr. Vales' briefing does not contain any argument regarding the statements, so Mr. Vales relies only on their connection to the allegedly unlawful search. Because the Court has concluded that the search was lawful, the Court **DENIES** Mr. Vales' Motion to Suppress those statements.

### IV.
### CONCLUSION

For the reasons stated herein, the Court **DENIES** Mr. Vales' Motion to Suppress. [Filing No. 23.]

Date: 10/4/2017

*[signature]*

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

William H. Dazey, Jr.
INDIANA FEDERAL COMMUNITY DEFENDERS
bill.dazey@fd.org

Bradley Paul Shepard
UNITED STATES ATTORNEY'S OFFICE
brad.shepard@usdoj.gov